Michael A. Sirignano
Barry I. Levy
Priscilla Kam
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

Docket No.: _____(     )

Plaintiffs,

-against-

BOULEVARD 9229 LLC, ISHBAY SHUKUROV,
ALBERTSON PHARMACY INC., ARKADIY
ABRAMOV, STERLING DRUGSTORE INC.,
VYACHESLAV MUSHYAKOV, STERLING MEDS
RX INC. D/B/A STERLING DRUGSTORE, DAURIYA
DEREVYANKO, STREAMLINE RX LLC, and
PAVAN MANTRIPRAGADA,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Boulevard 9229 LLC, Ishbay

Shukurov, Albertson Pharmacy Inc., Arkadiy Abramov, Sterling Drugstore Inc., Vyacheslav

Mushyakov, Sterling Meds RX Inc. d/b/a Sterling Drugstore, Dauriya Derevyanko, Streamline RX

LLC, and Pavan Mantripragada (collectively, "Defendants"), hereby allege as follows:

1.    This action seeks to terminate a massive, on-going fraudulent scheme perpetrated

by the Defendants who have exploited the New York "No-Fault" insurance system by submitting

more than $4,292,754.00 in fraudulent pharmaceutical billing to GEICO. Specifically, the

Defendants submitted, or caused to be submitted, thousands of fraudulent claims to GEICO

seeking payment for a set of specifically targeted medically unnecessary "pain relieving" topical

prescription drug products, primarily in the form of topical Diclofenac Gel 3%, Pennsaid

Transdermal Solution 2% (a topical diclofenac product), Lidocaine 5% Ointment, Lidocaine 5%

Patches, and MedX-Lidocaine Patches (collectively, the "Fraudulent Topical Pain Products"), as

well as various other medications (together with the Fraudulent Topical Pain Products, the

"Fraudulent Pharmaceuticals").

2.    Defendants Boulevard 9229 LLC ("Boulevard LLC"), Albertson Pharmacy Inc.

("Albertson Pharmacy"), Sterling Drugstore Inc. ("Sterling I"), and Sterling Meds RX Inc. d/b/a

Sterling Drugstore ("Sterling II") (collectively, the "Pharmacy Provider Defendants") and their

respective owners of record, Ishbay Shukurov ("Shukurov"), Arkadiy Abramov ("Abramov"),

Vyacheslav Mushyakov ("Mushyakov"), and Dauriya Derevyanko ("Derevyanko") (collectively,

the "Record Owner Defendants") dispensed the Fraudulent Pharmaceuticals to individuals

involved in automobile accidents and eligible for insurance coverage under policies of insurance

issued by GEICO (the "Insureds"). (The Pharmacy Provider Defendants and Record Owner

Defendants are collectively referred to as the "Pharmacy Defendants").

3.    The Defendants then submitted claims for reimbursement for the Fraudulent

Pharmaceuticals to GEICO and other New York automobile insurers under the names of the

Pharmacy Provider Defendants (i.e., Boulevard LLC, Albertson Pharmacy, Sterling I, and Sterling II), as well as under the name of Streamline RX LLC ("Streamline"), which is not a registered pharmacy.

4.     The scheme involving the Pharmacy Provider Defendants also involved two non-parties not named herein, Peter Khaim a/k/a Peter Khaimov ("P. Khaim") and Arkadiy Khaimov ("A. Khaimov") (together, the "Khaimovs"), who secretly participated in the ownership and control of the pharmacies in order to exploit the Insureds for financial gain, which was effectuated by having the Defendants target the prescription and dispensing of the Fraudulent Topical Pain Products in place of other effective, but much-less costly prescription and non-prescription drug products.  The Defendants did this because they were able to acquire the Fraudulent Topical Pain Products at low cost and then dispense and bill for them at exorbitant prices, to the extent they even actually dispensed the drug products at all.

5.     To evade detection by GEICO of the egregiously inflated, fraudulent charges, the Pharmacy Defendants submitted enormous volumes of fraudulent billing through each of the Pharmacy Provider Defendants for only a brief period of time in order to collect as much reimbursement as possible on their fraudulent claims, as quickly as possible, before abruptly ceasing all pharmacy operations. For example:

- From November 2019 to March 2020, Albertson Pharmacy billed GEICO over $1,035,900.00.   Approximately 97% of the billing submitted through Albertson Pharmacy was for Fraudulent Topical Pain Products. Albertson Pharmacy typically billed for topical pain patches such as Lidocaine 5% Patches and MedX-Lidocaine Patches at an average charge of $679.10 and $2,381.00, respectively, per prescription; Diclofenac Gel 3% at an average charge of $1,891.00 to $2,834.00 per prescription; and Lidocaine 5% Ointment at an average charge of $1,223.00 to $1,527.50 per prescription.

- From March 2020 to June 2020, Boulevard LLC billed GEICO over $1,499,300.00. Nearly 99% of the billing submitted through Boulevard LLC was for Fraudulent Topical Pain Products. Boulevard LLC typically billed for topical pain patches such

as Lidocaine 5% Patches and MedX-Lidocaine Patches at an average charge of $679.10 and $2,381.00, respectively, per prescription; Diclofenac Gel 3% at an average charge of $1,891.00 to $2,834.00 per prescription; Pennsaid Transdermal Solution 2% at an average charge of $2,631.00 per prescription; and Lidocaine 5% Ointment at an average charge of $1,223.00 to $1,527.50 per prescription.

- From November 2019 to August 2020, Sterling I billed GEICO over $256,300.00. Approximately 79% of the billing submitted through Sterling I was for Fraudulent Topical Pain Products. Sterling I typically billed for Lidocaine5% Patches at an average charge of $449.40 to $674.10 per prescription; Diclofenac Gel 3% at an average charge of $3,396.00 per prescription; Pennsaid Transdermal Solution 2% at an average change of $2.626.40 to $2,984.80 per prescription; and Lidocaine 5% Ointment at an average charge of $2,472.50 per prescription.

- From June 2020 to January 2021, Sterling II billed GEICO over $231,200.00. Approximately 94% of the billing submitted through Sterling II was for Fraudulent Topical Pain Products. Sterling II typically billed for Lidocaine 5% Ointment at an average charge of $1,978.00 to $2,472.50 per prescription and Lidocaine Patches at an average charge of $280.80 to $561.60 per prescription.

6.     In addition to the billing the Pharmacy Defendants submitted to GEICO through the Pharmacy Provider Defendants, Streamline and its owner of record, Pavan Mantripragada ("Mantripragada") (collectively, the "Streamline Defendants") submitted billing to GEICO for Fraudulent Pharmaceuticals dispensed by, among others, the Pharmacy Provider Defendants.

7.     From January 2020 to July 2021, the Streamline Defendants submitted over $1,269,800.00 in pharmaceutical billing to GEICO seeking reimbursement of No-Fault benefits even though it is not a registered pharmacy.The billed amounts by Streamline included Fraudulent Topical Pain Products in the form of Lidocaine 5% Ointment at an average charge of $1,141.50, Diclofenac Gel 3% at an average charge of $1,179.46, and Diclofenac Solution 1.5% at an average charge of $2,700.00, along with oral nonsteroidal anti-inflammatory drugs ("NSAIDs") and muscle relaxers at an average charge of $1,291.20 and $2,716.62, respectively, per prescription.

8.     At times, Streamline and the Pharmacy Provider Defendants submitted duplicate claims for reimbursement to GEICO seeking reimbursement for the same Fraudulent

Pharmaceutical(s) dispensed to the same Insured on or about the same date of service pursuant to prescriptions allegedly authorized by the same Prescribers.

9.      As an essential part of the fraudulent scheme, the Pharmacy Defendants engaged in illegal, collusive agreements with various prescribing healthcare providers (the "Prescribers") and persons who work at or are associated with various multidisciplinary medical clinics (the "Clinic Controllers") that almost exclusively treat No-Fault patients, and steered them to direct large volumes of prescriptions for the targeted Fraudulent Topical Pain Products to the Pharmacy Provider Defendants, in exchange for kickbacks.  At times, the prescriptions contained forged, stamped, or photocopied signatures and were generated solely for financial gain, without regard for genuine patient care.

10.      By this action, GEICO seeks to recover more than $552,200.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to the Pharmacy Provider Defendants and Streamline of over $2,694,200.00 in pending fraudulent New York No-Fault claims that the Defendants submitted or caused to be submitted through the Pharmacy Provider Defendants and Streamline because:

> (i)      The Pharmacy Provider Defendants and Streamline billed for pharmaceutical products that were prescribed and dispensed pursuant to illegal, collusive agreements, as well as predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care;
>
> (ii)      The Pharmacy Defendants participated in illegal, collusive relationships in which they steered Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Provider Defendants in exchange for unlawful kickbacks and other financial incentives;
>
> (iii)      the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had the Pharmacy Provider Defendants dispense in large

volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals;

(iv)   Streamline is not a licensed healthcare provider and, therefore, is not eligible for reimbursement of No-Fault benefits under New York law;

(v)   The Pharmacy Defendants made false statements on registration, licensing, and application documents filed on behalf of the Pharmacy Provider Defendants with the New York State Education Department Board of Pharmacy (the "NYS Pharmacy Board") in order to illegally conceal the identities of all of the true owners and controllers of the Pharmacy Provider Defendants in violation of law; and

(vi)   the Defendants made false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the names of the Pharmacy Provider Defendants and Streamline pursuant to illegal, invalid, duplicitous, and forged prescriptions.

11.   The Defendants fall into the following categories:

(i)   The Pharmacy Provider Defendants –Boulevard LLC, Albertson Pharmacy, Sterling I, and Sterling II – are New York limited liability companies and corporations engaged in a fraudulent scheme in which they dispensed and billed for the Fraudulent Pharmaceuticals pursuant to illegal, collusive agreements and predetermined protocols, without regard to genuine patient care, in order to submit to GEICO and other New York automobile insurers claims for reimbursement of No-Fault benefits to which they are not entitled;

(ii)   The Record Owner Defendants – Shukurov, Abramov, Mushyakov, and Derevyanko – are the record owners of the Pharmacy Provider Defendants;

(iii)   Streamline is a Florida limited liability company engaged in a fraudulent scheme in which it aided and abetted the Pharmacy Defendants in selecting and billing for the Fraudulent Topical Pain Products in order to exploit the reimbursement rates set forth by 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule").  Streamline is not registered with the NYS Pharmacy Board or with the Florida State Pharmacy Board, nor is it registered with the New York State Division of Corporations as either a New York limited liability company or a foreign business licensed to do business in New York;

(iv)   Mantripragada is the owner, president, and sole member of record of Streamline.

12.     The Defendants' scheme began in 2019 and continues uninterrupted to the present day as the Defendants continue to pursue collection on their unpaid fraudulent claims.

13.     As discussed more fully below, the Defendants at all times have known that: (i) the billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Pharmacy Defendants participated in illegal, collusive relationships in which they steered the Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Provider Defendants in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had the Pharmacy Provider Defendants dispense to Insureds in large volumes at exorbitant charges, in place of other effective, less costly pharmaceuticals; (iv) the Pharmacy Defendants made false statements on registration, licensing, and application documents filed on behalf of the Pharmacy Provider Defendants with the NYS Pharmacy Board in order to illegally conceal the identity of all of the true owners and controllers of the Pharmacy Provider Defendants; (v) Streamline is not a licensed healthcare provider and therefore is not eligible for reimbursement of No-Fault benefits; and (vi) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO in that they submitted fraudulent claims to GEICO for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, duplicitous, and forged prescriptions and continue to seek collection on unpaid fraudulent claims.

14.     Based on the foregoing, the Pharmacy Provider Defendants and Streamline do not have – and never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds.  The charts attached hereto as Exhibit "1" through "5" set forth the

fraudulent claims that have been identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail seeking reimbursement under New York's No-fault law.  As a result of the Defendants' scheme, GEICO has incurred damages of approximately $552,200.00.

## THE PARTIES

### I.    Plaintiffs

15.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.    Defendants

16.    Defendant Boulevard LLC is a New York limited liability company, formed on or about June 4, 2019 with its principal place of business at 9229 Queens Boulevard, Suite 1I, Rego Park, New York.  Boulevard LLC registered with the New York State Office of Professions ("NYSOP") on or about November 25, 2019.

17.    Boulevard LLC knowingly submitted fraudulent claims to GEICO and continues to seek reimbursement on unpaid fraudulent claims.

18.    Defendant Shukurov resides in and is a citizen of New York. Shukurov is the sole member of record of Boulevard LLC.

19.    Defendant Albertson Pharmacy is New York corporation incorporated on or about August 28, 2012 with its principal place of business at 1028 Willis Avenue, Albertson, New York. Albertson Pharmacy registered with the NYSOP on or about July 22, 2013.

20.     Albertson Pharmacy knowingly submitted fraudulent claims to GEICO and continues to seek reimbursement on unpaid fraudulent claims.

21.     Abramov resides in and is a citizen of New York. Abramov is the current owner of record of Albertson Pharmacy.

22.     Defendant Sterling I is New York corporation incorporated on or about December 13, 2018 with its principal place of business at 116-22A Metropolitan Avenue, Richmond Hill, New York. Sterling I registered with the NYSOP on or about March 13, 2019.

23.     Sterling I knowingly submitted fraudulent claims to GEICO and continues to seek reimbursement on unpaid fraudulent claims.

24.     Mushyakov resides in and is a citizen of New York. Mushyakov is the owner of record of Sterling I.

25.     Defendant Sterling II is New York corporation incorporated on or about December 30, 2019 with its principal place of business at 116-22A Metropolitan Avenue, Richmond Hill, New York.

26.     Sterling II is the successor of Sterling I which transferred its NYSOP registration to Sterling II on July 9, 2020.

27.     Sterling II knowingly submitted fraudulent claims to GEICO and continues to seek reimbursement on unpaid fraudulent claims.

28.     Derevyanko resides in and is a citizen of New York. Derevyanko is the owner of record of Sterling II.

29.     Streamline is a Florida limited liability company with its principal place of business at 2861 Executive Drive, Suite 210, Clearwater, Florida.

30.     Streamline knowingly submitted fraudulent claims to GEICO.

31.     Mantripraga resides in and is a citizen of Florida.  Mantripragada is the sole member of record of Streamline.

**III.     Other Pertinent Individuals**

32.     Although not named as Defendants in this Complaint, P. Khaim and A. Khaimov are relevant to understanding the claims in this action.

33.     P. Khaim and A. Khaimov do not appear as owners of record of the Pharmacy Provider Defendants, but secretly and illegally participated in the ownership and control of the Pharmacy Provider Defendants, and furthered the scheme by engaging in illegal, collusive agreements with Prescribers and Clinic Controllers, and steering them to direct large volumes of prescriptions for the targeted Fraudulent Topical Pain Products to the Pharmacy Provider Defendants, in exchange for kickbacks.

34.     P. Khaim and A. Khaimov were recently indicted for a running a multimillion-dollar scheme in which they secretly exercised ownership and control of multiple pharmacies – including several of the Pharmacy Provider Defendants – and used those pharmacies to submit millions of dollars in fraudulent claims to Medicare and Medicaid.  See United States of America v. Peter Khaim and Arkadiy Khaimov, 1:20-CR-00580(AMD)(RML).

**JURISDICTION AND VENUE**

35.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

36.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States

37.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

38.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of New York's No-Fault Laws

39.     GEICO underwrites automobile insurance in the State of New York.

40.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

41.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

42.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").   In the alternative,

healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

43. Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

44. The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

45. In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

46. Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II. An Overview of Applicable Licensing Laws

47. Pursuant to New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons

for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

48.     Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

49.     Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

50.     Pursuant to 8 N.Y.C.R.R. § 63.1(7) pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

51.     New York Education Law § 6810 prohibits pharmacies from dispensing when a prescription form for a drug includes any other drug.  Separate prescriptions are required for each drug prescribed and dispensed.

52.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

53.     New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

54.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

55.     New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

56.     Pursuant to New York Education Law § 6808(2)(c), "[t]he names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment. The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

57.     Pursuant to New York Education Law § 6808(e), pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

58.     Pursuant to New York Education Law § 6808(e), pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

59.     Pursuant to New York Education Law § 6808(h), "an application for registration as a pharmacy shall be over good moral character."

III.   **The Khaimovs' Undisclosed, Illegal Participation in the Ownership of the Pharmacy Provider Defendants**

60.     Although the Record Owner Defendants purport to own the Pharmacy Provider Defendants themselves and are identified as the owners of record on various formation documents and application, licensing, and registration documents filed with the NYS Pharmacy Board, the Khaimovs secretly participated in the ownership and control of the Pharmacy Provider Defendants.

61.     To conceal this fact, the Pharmacy Defendants misrepresented the identifies of all of the true owners and controllers of the Pharmacy Provider Defendants by falsely identifying the Record Owner Defendants as the only owners and controllers in application and registration documents filed with the NYS Pharmacy Board in violation of law.

62.     The Khaimovs were recently indicted for a running a multimillion-dollar scheme in which they secretly owned and controlled multiple pharmacies and used those pharmacies to submit millions of dollars in fraudulent claims to Medicare and Medicaid.  See United States of America v. Peter Khaim and Arkadiy Khaimov, 1:20-CR-00580(AMD)(RML).

63.     The original and superseding indictments (the "Khaimov Indictments") identified Sterling I and Albertson Pharmacy as pharmacies secretly owned and controlled by the Khaimovs and used in the scheme to defraud Medicare and Medicaid.

64.     The Khaimovs also have a secret ownership interest in Sterling II, which is simply a morph of Sterling I formed to evade detection of the Defendants' fraudulent scheme.

65.     Specifically, Sterling II was incorporated on December 30, 2019 – just twelve days after the United States Attorney filed the original Khaimov Indictment identifying Sterling I as one of the pharmacies secretly owned by the Khaimovs.

66.     Sterling I transferred its pharmacy registration to Sterling II effective July 9, 2020.

67.     Sterling II operated from the same location as Sterling I and employed at least one pharmacist who was also employed by Sterling I.

68.     Checks issued by GEICO to Sterling I – pursuant to claims for reimbursement submitted by Sterling I – were endorsed and deposited by Sterling II.

69.     Mushyakov, the record owner of Sterling I, was also the record owner of RX For You Corp. – a pharmacy that operated at 1767 Southern Boulevard, Bronx, New York (the "1767 Southern Boulevard Clinic").  P. Khaim was the leaseholder at this location and, upon information and belief, was one of the true owners of RX For You Corp.

70.     The Khaimovs also have a secret ownership interest in Boulevard LLC.

71.     Specifically, pharmacist Samad Tirmizi copied Defendant P. Khaim and identified him as an owner of Boulevard LLC on correspondence to the NYS Pharmacy Board advising the board of his resignation as Boulevard LLC's supervising pharmacist.  Moreover, the name "Peter Khaim" appears on the printed header on documents faxed to GEICO in support of Boulevard LLC's claims for reimbursement.

72.     Boulevard LLC and Albertson Pharmacy also used the same postal meter as several other pharmacies identified in the Khaimov Indictments as being secretly owned by the Khaimovs including Malvina Drug Corp. ("Malvina"), IVS Pharmacy Corp. ("IVS Pharmacy"), Merrick Wellness Inc. ("Merrick Wellness"), and LPM Pharmacy Inc. ("LPM Pharmacy").

73.     Boulevard LLC and Malvina used the same PO Box, and the same individual executed documents on behalf of Boulevard LLC, Malvina, and yet another pharmacy identified in the Khaimov Indictments, JPRX Corp.

74.     The supervising pharmacist of Boulevard LLC was also the supervising pharmacist of IVS Pharmacy.

75.     IVS Pharmacy transferred prescriptions to Albertson Pharmacy.

76.     Albertson Pharmacy and JPRX Corp. also used the same PO Box.

77.     Moreover, the same attorney – Olga Iskhakova, Esq. – assisted in the NYS Pharmacy Board registration of, among others, Boulevard LLC, Albertson Pharmacy, Sterling II, and Malvina.

78.     In further keeping with the fact that the Khaimovs secretly participated in the ownership and control of the Pharmacy Provider Defendants, and that the prescriptions routed to the Pharmacy Provider Defendants and submitted to GEICO in support of their claims are generated pursuant to illegal financial and referral arrangements, one of the professional corporations that steered the most prescriptions to the Pharmacy Provider Defendants – Metro Pain Specialists, P.C. – operates from at least five No-Fault Clinics that have been connected to P. Khaim, including the 1767 Southern Boulevard Clinic where RX For You Corp. once operated.

## IV.     The Defendants' Scheme Involving The Fraudulent Pharmaceuticals

### A.     Overview of the Scheme

79.     Beginning in 2019, and continuing uninterrupted through the present day, the Defendants masterminded and implemented a fraudulent scheme in which they used the Pharmacy Provider Defendants to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in exorbitant charges relating to Fraudulent Pharmaceuticals purportedly dispensed to Insureds.

80.     Each of the Pharmacy Provider Defendants purported to be a storefront neighborhood pharmacy operating in Queens County or Nassau County, but instead each operated as part of a large-scale fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent

Pharmaceuticals, while intentionally ignoring a vast array of prescription and over-the-counter medications readily available at a fraction of the cost.

81.   Unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, the Pharmacy Provider Defendants' business largely focused on a limited set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products).

82.   Specifically, the Fraudulent Topical Pain Products made up approximately 99% of the claims the Pharmacy Defendants submitted to GEICO through Boulevard LLC; 97% of the claims the Pharmacy Defendants submitted to GEICO through Albertson Pharmacy; 79% of the claims the Pharmacy Defendants submitted through Sterling I; and 94% of the claims the Pharmacy Defendants submitted through Sterling II.

83.   The claims the Pharmacy Defendants submitted through the Pharmacy Provider Defendants for Fraudulent Topical Pain Products resulted in billing to GEICO of over $3,022,900.00 over the course of fourteen months.

84.   To evade detection by GEICO of the egregiously inflated and fraudulent charges, the Pharmacy Defendants caused enormous volumes of fraudulent billing to be submitted through each of the Pharmacy Provider Defendants for only a brief period of time collecting as much reimbursement as possible, as quickly as possible, before abruptly ceasing all pharmacy operations.

85.   For example, the Pharmacy Defendants implemented their fraudulent scheme using Albertson Pharmacy from November 2019 to March 2020 at which time the Pharmacy Defendants ceased operating Albertson Pharmacy and commenced billing through Boulevard LLC.  The Pharmacy Defendants implemented their scheme using Boulevard LLC from March 2020 to June 2020.  Likewise, the Pharmacy Defendants caused Sterling I to operate from November 2019 to

August 2020.  Once Sterling I was identified in the Khaimov Indictments, the Defendants ceased operating Sterling I and caused the Pharmacy Defendants to continue the fraudulent scheme under Sterling II which billed GEICO from June 2020 to January 2021.

86.     In keeping with the fact that the Pharmacy Provider Defendants were part of the same scheme involving the Khaimovs, Insureds often received prescriptions from more than one of the Pharmacy Provider Defendants over the course of their treatment as one Pharmacy Provider Defendant ceased operation and another started.

87.     As discussed more fully below, the Pharmacy Defendants targeted the Fraudulent Topical Pain Products because they could easily use them to exploit Insureds' No-Fault Benefits. Specifically, the Pharmacy Defendants could acquire the Fraudulent Topical Pain Products at low costs and submit egregiously inflated claims for reimbursement to GEICO and other New York No-Fault insurers.

88.     The Streamline Defendants assisted the Pharmacy Defendants in selecting Fraudulent Topical Pain Products that are easily exploitable due to their high profit margins.  In fact, Streamline's entire business model is aimed at maximizing pharmacy revenue by "providing "guidance to optimize [pharmacies'] formulary and substitution protocols leveraging high-margin mediations" in order to "quadruple [] reimbursements for workers compensation, no fault, personal injury and auto prescriptions."

89.     The Streamline Defendants also purport to provide billing services on behalf of pharmacies, however, the billing submitted through Streamline was submitted using Streamline's own tax identification number ("TIN") despite the fact Streamline is not a licensed pharmacy or provider of healthcare services and therefore not eligible for reimbursement of No-Fault Benefits.

90.     In keeping with the fact that Streamline is not eligible for reimbursement of No-Fault Benefits, the Streamline Defendants did not obtain executed assignment of benefits forms ("AOBs") from Insureds that would enable them to submit claims for reimbursement directly to insurance companies.

91.     In furtherance of the fraudulent scheme, the Pharmacy Defendants entered into illegal, collusive agreements with the Prescribers and the Clinic Controllers and steered them to direct large volumes of prescriptions to the Pharmacy Provider Defendants for the targeted Fraudulent Topical Pain Products, purportedly to treat patients at various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics").

92.     The Pharmacy Provider Defendants received medically unnecessary prescriptions from the Prescribers and Clinic Controllers at the No-Fault Clinics in exchange for the payment of kickbacks and pursuant to predetermined treatment protocols.

93.     The prescriptions received by Pharmacy Provider Defendants were often issued on preprinted template prescription forms.

94.     The preprinted template prescription forms (the "Fraudulent Prescription Forms") were nothing more than "checklist" type order forms that enabled Prescribers to simply check-off or circle predetermined Fraudulent Pharmaceuticals that were already printed on the forms.

95.     The Pharmacy Defendants created and distributed the Fraudulent Prescription Forms in violation of law and to further facilitate the prescription of the targeted Fraudulent Pharmaceuticals and the steering of those prescriptions to the Pharmacy Provider Defendants to submit in support of their fraudulent claims for reimbursement.

96.     Notably, the No-Fault Clinics and the healthcare providers operating therefrom who directed prescriptions to the Pharmacy Provider Defendants have often been the subject of

investigations and lawsuits commenced by various New York insurers with regard to their fraudulent billing and treatment practices, and have been the source of excessive, fraudulent treatment and billing schemes aimed at generating profits without regard to patient care.

97.    For example, Prescriber Kristappa Sangavaram, M.D. ("Dr. Sangavaram") recently consented to a voluntary surrender and revocation of his New Jersey medical license for a period of at least 45 months, and to not practice in any other state for the duration of the revocation, due to his violation of a prior Consent Order with the New Jersey State Board of Medical Examiners (the "NJ Board"). The NJ Board's investigation of Dr. Sangavaram's violation of the prior Consent Order revealed, among other things, that Dr. Sangavaram allowed his employees to issue prescriptions for controlled substances to patients by providing them with pre-signed prescription blanks. See Consent Order In the Matter of the Suspension or Revocation of the License of Kristappa Sangavaram, M.D., filed August 26, 2021.

98.    In keeping with the fact that the Pharmacy Defendants illegally steered the Prescribers and Clinic Controllers at the No-Fault Clinics to provide the Pharmacy Provider Defendants with prescriptions for the Fraudulent Pharmaceuticals, Insureds were never given the option to use a pharmacy of their choosing.

99.    Instead, the Pharmacy Defendants colluded with the Prescribers and Clinic Controllers to ensure that they directed the prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Provider Defendants, regardless of the distance of the pharmacies from the Insureds or the No-Fault Clinics where they were treating.

100.    In most cases, the Pharmacy Provider Defendants either purported to deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes or the Fraudulent Pharmaceuticals

were given to Insureds directly by the front desk staff at the various No-Fault Clinics without the Insured ever seeing the prescription.

101.    In some cases, the Insureds were not even aware that a Fraudulent Pharmaceutical dispensed by the Pharmacy Provider Defendants was prescribed to them until the medication was delivered to them or distributed to them by the front desk staff.

102.    At times, the Pharmacy Provider Defendants submitted claims for reimbursement to GEICO for medications that were never actually dispensed to Insured, including claims for medications that Insureds refused.

103.    The Defendants spearheaded their pharmaceutical fraud scheme involving the Prescribers and the Clinic Controllers knowing that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the Fraudulent Pharmaceuticals were the product of illegal, collusive arrangements intended to inflate the billing from the Pharmacy Provider Defendants and Streamline to insurers and to financially enrich the Defendants; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and dispensed in large volumes to Insureds at inflated charges; (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of other prescription and over-the-counter medications proven to have therapeutic effects and available at a fraction of the cost; (v) the Pharmacy Defendants made false statements on registration, licensing, and application documents filed on behalf of the Pharmacy Provider Defendants with the NYS Pharmacy Board in order to illegally conceal the fact that the Khaimovs secretly participated in the ownership and control of the

Pharmacy Provider Defendants; and (vi) Streamline is not a licensed healthcare provider and therefore is not eligible for reimbursement of No-Fault benefits..

**B.**   **The Fraudulent Pharmaceuticals Were Prescribed and Dispensed For Financial Gain and Without Genuine Regard for Patient Care**

104.   In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, Insureds treated by the Prescribers at the No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from the Pharmacy Provider Defendants – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

105.   Evidence-based best practices guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits. For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an oral non-steroidal anti-inflammatory drug ("NSAID") for the initial management of pain. Oral NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including the use of muscle relaxers and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

106..   More recently, in 2019 the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report which focused on pain management and the treatment of acute and chronic pain.  According to the DHHS report, such pain should be treated using an individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an

individual patient, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate.  Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., oral NSAIDs) should be used as first line therapy for patients for whom medications are clinically appropriate.

107.    Notably, for a drug to alleviate pain it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

108.    Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated. For example – patients with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

109.    Despite these guidelines and the basic goal of helping patients get better in a timely fashion, the Insureds who received pharmaceuticals from the Pharmacy Provider Defendants, and who were treated by the Prescribers at the No-Fault Clinics associated with the Clinic Controllers, were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

110.    In furtherance of the scheme, and in keeping with the fact that the Fraudulent Pharmaceuticals dispensed by the Pharmacy Provider Defendants were prescribed pursuant to collusive arrangements and predetermined protocols rather than genuine patient care, the

Pharmacy Defendants created and distributed to certain Prescribers and Clinic Controllers what is essentially a product list – disguised as a "prescription order form" – of the various Fraudulent Pharmaceuticals that the Pharmacy Provider Defendants dispensed (i.e., the Fraudulent Prescription Forms).

111. The Fraudulent Prescription Forms listed the names of the Fraudulent Pharmaceuticals that the Defendants specifically targeted as part of the fraudulent scheme and the quantity in which they were to be prescribed and dispensed to Insureds.

112. The Fraudulent Prescription Forms ensured that the Prescribers would prescribe predetermined Fraudulent Topical Pain Products such as Diclofenac Gel 3%, Pennsaid Transdermal Solution 2%, Lidocaine 5% Ointment, and various forms of Lidocaine Patches which the Pharmacy Provider Defendants and Streamline could bill for at egregiously inflated rates.

113. Additionally, the Fraudulent Prescription Forms allowed the Prescribers to prescribe other Fraudulent Pharmaceuticals, including predetermined oral medications including oral NSAIDs such as naproxen and its name brand equivalents, and muscle relaxers such as cyclobenzaprine and its name brand equivalents, among others, to further increase the Defendants' profits.

114. The Prescribers allegedly chose which predetermined product(s) should be dispensed to the Insureds by marking off or circling one of the designated boxes on the Fraudulent Prescription Forms.

115. In some instances, the Fraudulent Prescription Forms were even tailored to a specific Prescriber in that the Prescriber's name, address, phone number, license number and national provider identification ("NPI") number were preprinted on the Fraudulent Prescription Form.

116.     Additionally, many of the Fraudulent Prescription Forms created by the Pharmacy Defendants and distributed to the Clinic Controllers and Prescribers contained a preprinted, generic "Statement of Medical Necessity" alleging that topical pain products were necessary to avoid side effects of orally administered medications, and to lower doses of and prevent dependence on oral medications.  Specifically, the Fraudulent Prescription Forms contained the following preprinted statement:

> Statement of Medical Necessity:
>
> Side effects associated with oral administration can often be avoided when medications are used topically.  When medications are administered topically, they are not absorbed through the gastrointestinal system and do not undergo first pass hepatic metabolism. Topical creams/patches will be used in conjunction with lower doses of oral medications to prevent dependence and side effects of oral medications.

117.     The "Statement of Medical Necessity" included on these prescriptions holds no pharmacologic validity.  First-pass hepatic metabolism is a process where drugs absorbed from the gastrointestinal tract travel first to the liver through the portal vein, where a fraction of drug is broken down and removed from the bloodstream. While the amount of the drug removed from the bloodstream through first-pass hepatic metabolism varies from medication to medication, certain drug ingredients in the Fraudulent Topical Pain Products, such as diclofenac sodium, are not affected significantly by first-pass metabolism and, therefore, can be administered orally with an efficacious outcome. Moreover, first-pass metabolism is irrelevant with regard to the safety of the Fraudulent Topical Pain Products.

118.     Additionally, the blanket statement purporting to express concern about dependency and side effects associated with oral administration of pharmaceuticals is absurdly disingenuous. Specifically, the preprinted statement of medical necessity states, "Topical

creams/patches will be used in conjunction with *lower doses* of oral medications to prevent dependence and side effects of oral medications. Nevertheless, the Prescribers often prescribed or recommended the Insureds continue taking *maximum daily doses* of oral medications, including NSAIDs and muscle relaxers, contemporaneous to prescribing the Fraudulent Topical Pain Products.

119.     Notably, New York law prohibits the Pharmacy Provider Defendants from dispensing pharmaceuticals in response to these types of forms with multiple drug products, and likewise prohibits the Prescribers from writing prescriptions on these types of forms.

120.     Specifically, New York Education Law § 6810(7) provides as follows:

> "No prescription for a drug written in this state by a person authorized to issue such prescription shall be on a prescription form which authorizes the dispensing or compounding of any other drug. No drug shall be dispensed by a pharmacist when such prescription form includes any other drug."

121.     In other words, the Education Law prohibits pharmacists from dispensing multiple drugs listed on the same prescription – each prescription medication should be written on its own separate prescription.  Id.

122.     Moreover, as of March 27, 2016, to combat the growing problem of prescription fraud, N.Y. Public Health Law requires that all prescriptions issued in New York State – for both controlled and non-controlled substances – must be prescribed electronically.

123.      In the limited circumstances in which a prescription is excepted from the electronic prescription requirement, N.Y. Public Health Law requires that a written prescription in New York State be written on an official *serialized* New York State prescription blank bearing the prescriber's signature as well as the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.   See, N.Y. Public Health Law § 281, see also N.Y. Education Law § 6810(8).

124.    The Fraudulent Prescription Forms submitted in the support of Pharmacy Provider Defendants' billing are invalid and illegal in that they are not electronic prescriptions nor are they official serialized New York State prescription blanks bearing the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.

125.    The Pharmacy Defendants provided certain Prescribers and Clinic Controllers with the Fraudulent Prescription Forms to steer the Prescribers and Clinic Controllers to prescribe, or cause the prescription of, as many prescriptions as possible for the Fraudulent Pharmaceuticals, in exchange for kickbacks and other financial incentives.

126.    The Defendants used the illegal, invalid, and fraudulent prescriptions to bill GEICO and other insurers millions of dollars for the Fraudulent Pharmaceuticals.

127.    In keeping with the fact that the Fraudulent Pharmaceuticals were prescribed, dispensed, and billed pursuant to fraudulent, predetermined protocols and collusive arrangements, in many instances the Fraudulent Prescription Forms submitted to GEICO by the Pharmacy Defendants in support of the Pharmacy Provider Defendants' claims often contained stamped, electronic, or photocopied signatures. For example, in support of their claims for reimbursement, the Pharmacy Provider Defendants submitted Fraudulent Prescriptions Forms which appear to contain stamped, electronic, or photocopied prescriptions for the following Prescribers:

- Dr. Fersel (a representative sample of Fraudulent Prescriptions Forms which appear to contain a stamped, electronic, or photocopied version of Dr. Fersel's signature is attached at Exhibit "6".

- Richard Apple, M.D. ("Dr. Apple") (a representative sample of Fraudulent Prescriptions Forms which appear to contain a stamped, electronic, or photocopied version of Dr. Apple's signature is attached at Exhibit "7".

- Heong Lim, N.P ("NP Lim") (a representative sample of Fraudulent Prescriptions Forms which appear to contain a stamped, electronic, or photocopied version of NP Lim's signature is attached at Exhibit "8".

- Navdeep Kaur, N.P ("NP Kaur") (a representative sample of Fraudulent Prescriptions Forms which appear to contain a stamped, electronic, or photocopied version of NP Kaur's signature is attached at Exhibit "9". Notably, two of the prescriptions in this sample are dated May 20, 2020 and appear to be **completely identical** with the exception of the patient name which was changed so that the Pharmacy Defendants could submit the prescription through Boulevard LLC in support of multiple claims.

128. In even more egregious instances, the prescriptions for the Fraudulent Pharmaceuticals submitted to GEICO by the Pharmacy Defendants in support of the Pharmacy Provider Defendants' claims appear to have been forged. Specifically, GEICO received Fraudulent Prescription Forms for the following Prescribers which appear to contain inconsistent signatures:

- Dr. Kim (a representative sample of Fraudulent Prescriptions Forms which appear to contain multiple versions of Dr. Kim's purported signature is attached at Exhibit "10".

- Dr. Alleyne (a representative sample of Fraudulent Prescriptions Forms which appear to contain multiple versions of Dr. Alleyne's purported signature is attached at Exhibit "11".

- Hong Pak, M.D. ("Dr. Pak") (a representative sample of Fraudulent Prescriptions Forms which appear to contain multiple versions of Dr. Pak's purported signature is attached at Exhibit "12".

- Camari Wallace, M.D. ("Dr. Wallace") (a representative sample of Fraudulent Prescriptions Forms which appear to contain multiple versions of Dr. Wallace's purported signature is attached at Exhibit "13".

- Doenarine Rampershad, N.P. ("NP Rampershad") (a representative sample of Fraudulent Prescriptions Forms which appear to contain multiple versions of NP Rampershad's purported signature is attached at Exhibit "14".

129. Moreover, to the extent the prescriptions were even genuine, the Pharmacy Provider Defendants at times sought reimbursement for Fraudulent Pharmaceuticals pursuant to the **same exact prescriptions** submitted by other pharmacies in support of their claims for reimbursement,

or pursuant to what appear to be multiple prescriptions issued by the same Prescriber on the same

date of service, to the same patient, for the same Fraudulent Pharmaceuticals.  For example:

- On November 4, 2019, Sterling I billed for Lidocaine 5% Ointment, cyclobenzaprine, and naproxen allegedly dispensed to Insured I.M. pursuant to a prescription issued by Dr. Alleyne on October 25, 2019.  Three days later, on November 7, 2019, Quick Scripts Inc., dispensed and billed for Lidocaine 5% Ointment, cyclobenzaprine, and naproxen pursuant to the **same exact prescription** issued by Dr. Alleyne on October 25, 2019 and previously submitted by Sterling I on November 4, 2019 in support of its claims for reimbursement. Copies of the prescription issued by Dr. Alleyne to Insured I.M. are annexed hereto at Exhibit "15" along with the corresponding bills submitted by Sterling I and Quick Scripts Inc.  Additionally, Insured I.M. also received Lidocaine 5% Ointment, Lidocaine 5% Patches, and omeprazole from Quick Scripts Inc. on September 20, 2019; Lidocaine 5% Ointment from IVS Pharmacy on November 1, 2019; Lidocaine 5% Ointment, celecoxib, and omeprazole from Albertson Pharmacy on December 3, 2019; and Lidocaine 5% Ointment and naproxen from Grace Pharmacy on February 14, 2020.

- On March 15, 2020, Boulevard LLC billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% allegedly dispensed to Insured S.L. pursuant to a prescription issued by Dr. Kim on March 9, 2020.  On April 24, 2020, Atlas Pharmacy LLC ("Atlas Pharmacy") dispensed and billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% pursuant to the **same exact prescription** issued by Dr. Kim on March 9, 2020 and previously submitted by Boulevard LLC on March 15, 2020 in support of its claims for reimbursement. Copies of the prescription issued by Dr. Kim to Insured S.L. are annexed hereto at Exhibit "16" along with the corresponding bills submitted by Boulevard LLC and Atlas Pharmacy. Additionally, Insured S.L. also received Lidocaine 5% Ointment and MedX-Lidocaine Patches from Albertson Pharmacy on January 6, 2020 and February 6, 2020; Diclofenac Solution 1.5%, Lidocaine 5% Ointment, naproxen, and cyclobenzaprine from Streamline on March 31, 2020; and naproxen from Streamline on October 31, 2020.

- On March 15, 2020, Boulevard LLC billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% allegedly dispensed to Insured P.H. pursuant to a prescription issued by Dr. Kim on March 9, 2020.  On April 24, 2020, Atlas Pharmacy dispensed and billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% pursuant to the **same exact prescription** issued by Dr. Kim on March 9, 2020 and previously submitted by Boulevard LLC on March 15, 2020 in support of its claims for reimbursement. Copies of the prescription issued by Dr. Kim to Insured P.H. are annexed hereto at Exhibit "17" along with the corresponding bills submitted by Boulevard LLC and Atlas Pharmacy. Additionally, Insured P.H. also received Diclofenac Gel 3%, cyclobenzaprine, and Celebrex from Albertson Pharmacy on December 24, 2019; Lidocaine 5%

Ointment and MedX-Lidocaine Patches from Albertson Pharmacy on February 11, 2020; and Diclofenac Solution 1.5%, Lidocaine 5% Ointment, naproxen, and cyclobenzaprine from Streamline on March 31, 2020.

- On March 10, 2020, Atas Pharmacy billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% allegedly dispensed to Insured N.E. pursuant to a prescription issued by Dr. Baldonado on March 3, 2020. Two days later, on March 12, 2020, Boulevard LLC billed for Diclofenac Gel 3%, Lidocaine 5% Ointment, and naproxen allegedly dispensed to Insured N. E. pursuant to a second prescription issued by Dr. Baldonado on March 3, 2020. Copies of the prescriptions issued by Dr. Baldonado to Insured N.E. are annexed hereto at Exhibit "18" along with the corresponding bills submitted by Boulevard LLC and Atlas Pharmacy.

- On December 13, 2019, Atlas Pharmacy billed for Diclofenac Gel 3%, cyclobenzaprine, and celecoxib allegedly dispensed to Insured P.J. pursuant to a prescription issued by Dr. Pak on December 4, 2019. On December 24, 2019, Albertson Pharmacy billed for Diclofenac Gel 3%, cyclobenzaprine, and Celebrex (the name brand equivalent of celecoxib) allegedly dispensed to P.J. pursuant to a second prescription issued by Dr. Pak on December 11, 2019 – just one week after he allegedly prescribed a 30-day supply of each of these pharmaceuticals dispensed by Atlas Pharmacy. Copies of the prescriptions issued by Dr. Pak to Insured P.J. are annexed hereto at Exhibit "19" along with the corresponding bills submitted by Atlas Pharmacy and Albertson Pharmacy.

- On December 5, 2019, Atlas Pharmacy billed for Diclofenac Gel 3%, cyclobenzaprine, and celecoxib allegedly dispensed to Insured D.B. pursuant to a prescription issued by Dr. Pak on November 25, 2019. On December 24, 2019, Albertson Pharmacy billed for Diclofenac Gel 3%, cyclobenzaprine, celecoxib allegedly dispensed to D.B. pursuant to a second prescription issued by Dr. Pak on December 2, 2019 – just one week after he allegedly prescribed a 30-day supply of each of these pharmaceuticals dispensed by Atlas Pharmacy. Copies of the prescriptions issued by Dr. Pak to Insured D.B. are annexed hereto at Exhibit "20" along with the corresponding bills submitted by Atlas Pharmacy and Albertson Pharmacy.

130.    In keeping with the fact that the Fraudulent Pharmaceuticals were prescribed, dispensed, and billed pursuant to fraudulent, predetermined protocols and collusive arrangements, and that, at times, the Fraudulent Prescription Forms contained forged, stamped, electronic, or photocopied signatures, in most instances the prescriptions were inconsistent with the purported Prescriber's examination report and treatment plan.

131.    Specifically, the Prescribers' examination reports and treatment plans either indicated no medications were to be prescribed at all, or indicated different medications were to be prescribed and dispensed than those marked off or circled on the Fraudulent Prescription Forms. For example:

- Insured A.B. was allegedly injured in a motor vehicle accident on November 10, 2019.  On January 29, 2020, she underwent an examination with Dr. Alleyne of Metro Pain Specialist, P.C. ("Metro Pain") who documented in his examination report that A.B. should receive a prescription for Lidocaine 5% Ointment.   On February 3, 2020, Albertson Pharmacy dispensed and billed for Lidocaine 5% Ointment **and** MedX-Lidocaine Patches and naproxen pursuant to a Fraudulent Prescription Form allegedly signed by Dr. Alleyne on January 29, 2020.   On April 23, 2020, A.B. underwent an examination with Dr. Abbattematteo, also of Metro Pain. Dr. Abbattematteo left the medication section of his examination report blank indicating he did not recommend any prescription medications as part of his treatment plan. Nevertheless, on April 29, 2020, Boulevard LLC dispensed and billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% pursuant to a Fraudulent Prescription Form allegedly signed by Dr. Abbattematteo on April 23, 2020.

- Insured R.R. was allegedly injured in a motor vehicle accident on October 19, 2019. On December 18, 2019, he underwent an examination with Theodros Seyoum, M.D. ("Dr. Seyoum") of Metro Pain. Dr. Seyoum left the medication section of his examination report blank noting the patient was scheduled to begin cancer treatments and indicating he did not recommend any prescription medications as part of his treatment plan. Nevertheless, on December 20, 2019, Albertson Pharmacy dispensed and billed for Lidocaine Patches 5%, Diclofenac Gel 3%, baclofen, and Celebrex pursuant to a Fraudulent Prescription Form allegedly signed by Dr. Seyoum on December 18, 2019.

- Insured J.A. was allegedly injured in a motor vehicle accident on October 16, 2019. On November 19, 2019, he underwent an examination with Dr. Seyoum of Metro Pain who documented in his examination report that the patient should receive prescriptions for Flexeril (cyclobenzaprine) and Diclofenac Gel 3%.    On November 21, 2019, Albertson Pharmacy dispensed and billed for cyclobenzaprine, Diclofenac Gel 3%, **and** Lidocaine 5% Patches pursuant to a Fraudulent Prescription Form allegedly signed by Dr. Seyoum on November 19, 2019.  J.B. underwent a follow-up examination with Dr. Seyoum on January 15, 2020 at which time Dr. Seyoum documented in his examination report that J.B. should receive prescriptions for Diclofenac Gel 3% and acetaminophen.  On January 17, 2020, Albertson Pharmacy dispensed and billed for Diclofenac Gel 3%, acetaminophen, **and** Lidocaine 5% Patches pursuant to a Fraudulent Prescription Form allegedly signed by Dr. Seyoum on January 15, 2020.

- Insured J.T. was allegedly injured in a motor vehicle accident on February 13, 2020. On February 20, 2020, she underwent an examination with Dr. Alleyne of Metro Pain who documented in his examination report that the patient should receive prescriptions for naproxen, Flexeril (cyclobenzaprine), and Lidocaine 5% Ointment. On February 26, 2020, Albertson Pharmacy dispensed and billed for naproxen, cyclobenzaprine, Lidocaine 5% Ointment, **and** Pennsaid Transdermal Solution 2% pursuant to a Fraudulent Prescription Form allegedly signed by Dr. Alleyne on February 20, 2020. On March 26, 2020, Dr. Alleyne performed a follow-up examination on J.T. and documented in his examination report that the patient should receive a prescription for Lidocaine 5% Ointment and that the patient "**only uses the Lidocaine 5% Ointment [and] does not want any other medicines**." Despite this, on March 27, 2020, Boulevard LLC dispensed and billed for Lidocaine 5% Ointment **and** naproxen and Pennsaid Transdermal Solution 2% pursuant to a Fraudulent Prescription Form allegedly signed by Dr. Alleyne on March 26, 2020. Notably, naproxen and Pennsaid Transdermal Solution 2% are both NSAIDs and their simultaneous prescription constitutes therapeutic duplication and exposes the Insured to increased risks. On April 30, 2020, J.T. underwent an examination with Dr. Kim of Metro Pain who left the medication section of his examination report blank indicating he did not recommend any prescription medications as part of his treatment plan. Nevertheless, on May 4, 2020, Boulevard LLC dispensed and billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% pursuant to a Fraudulent Prescription Form allegedly signed by Dr. Kim on April 30, 2020. Significantly, this patient's medical history included gastric sleeve surgery. A patient who undergoes this surgery cannot take any NSAIDs within one year of surgery, and any NSAIDs prescribed after the first year should always be prescribed with a proton pump inhibitor (i.e., omeprazole). Despite the foregoing, there is no indication in the Prescribers' notes of when the patient underwent the gastric sleeve surgery, nor does it appear the patient was prescribed a proton pump inhibitor.

- Insured V.G. was allegedly injured in a motor vehicle accident on August 7, 2019. On October 15, 2019, she underwent an examination with Se Young Oh, N.P. ("NP Oh") – a nurse practitioner for Dr. Sangavaram of Riverside Medical Services, P.C. ("Riverside Medical"). In her examination report, NP Oh specifically states that she did not recommend the Insured receive any prescription medications. The report was also signed by Dr. Sangavaram. Nevertheless, on November 8, 2019, Sterling I dispensed and billed for Lidocaine 5% Ointment, naproxen, and cyclobenzaprine pursuant to a Fraudulent Prescription Form allegedly signed by Dr. Sangavaram on October 15, 2019.

- Insured I.C. was allegedly injured in a motor vehicle accident on May 30, 2020. On June 23, 2020, she underwent an examination with Dr. Alleyne of Metro Pain who documented in his examination report that the patient should receive prescriptions for Flexeril (cyclobenzaprine), naproxen, and Lidocaine 5% Ointment. On July 31, 2020, Sterling I dispensed and billed for cyclobenzaprine,

naproxen, Lidocaine 5% Ointment, **and** Lidocaine 5% Patches pursuant to a Fraudulent Prescription Form allegedly signed by Dr. Alleyne on June 23, 2020.

- Insured E.H. was allegedly injured in a motor vehicle accident on February 18, 2020.  Later that day she underwent an examination with Dr. Seyoum of Metro Pain who documented in his examination report that the patient should receive a prescription for Diclofenac Gel 3%.   On February 26, 2020, Albertson Pharmacy dispensed and billed for Diclofenac Gel 3% **and** Lidocaine 5% Patches pursuant to a Fraudulent Prescription Form allegedly signed by Dr. Seyoum on February 18, 2020.  On July 30, 2020, E. Hervie underwent an examination with NP Lim of Metro Pain who documented in his report that the patient should receive a prescription for Lidocaine 5% Ointment.  On August 5, 2020, Sterling II dispensed and billed for Lidocaine 5% Ointment **and** Lidocaine 5% Patches pursuant to a Fraudulent Prescription Form allegedly signed by NP Lim on July 30, 2020.  On September 1, 2020, E. Hervie underwent an examination with Dr. Alleyne of Metro Pain who documented in his report that the patient should receive prescriptions for Lidocaine 5% Ointment, naproxen, and Flexeril (cyclobenzaprine).  On September 18, 2020, Sterling II dispensed and billed for Lidocaine 5% Ointment, naproxen, cyclobenzaprine, **and** Lidocaine 5% Patches pursuant to a Fraudulent Prescription Form allegedly signed by Dr. Alleyne on September 1, 2020.

- Insured N.K. was allegedly injured in a motor vehicle accident on February 19, 2019.  She sought treatment with Metro Pain for several months and was ultimately discharged by Dr. Kim on September 30, 2019.  Nevertheless, on October 11, 2019 and November 11, 2019, **after the Insured had been discharged** from treatment, Streamline billed for naproxen pursuant to prescriptions allegedly authorized by Dr. Wallace of Metro Pain.

- Insured S.L. was allegedly injured in a motor vehicle accident on December 21, 2019. He sought treatment with Metro Pain for several months and was ultimately discharged by Dr. Kim on June 23, 2020.  Nevertheless, on October 31, 2020, Streamline billed for naproxen pursuant to a prescription allegedly authorized by Dr. Kim **over four months after he discharged the Insured from treatment**.

- Insured R. B.was allegedly injured in a motor vehicle accident on February 8, 2020. He sought treatment with Metro Pain for several months and was ultimately discharged by Dr. Kim on October 7, 2020.  Nevertheless, on December 24, 2020, Streamline billed for naproxen and Diclofenac Solution 1.5% pursuant to a prescription allegedly authorized by Dr. Kim **two and a half months after he discharged the Insured from treatment**.

132.   At times, it appears the Fraudulent Prescription Forms were altered to include additional medications by someone other than the Prescriber who allegedly filled out the form in the first instance.

133.    In keeping with the fraudulent scheme spearheaded by the Defendants, the Insureds who received pharmaceuticals from the Pharmacy Provider Defendants, and who were treated by the Prescribers at the No-Fault Clinics associated with the Clinic Controllers, were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

134.    As part of the predetermined protocol, the Prescribers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous and excessive healthcare services that the providers at the No-Fault Clinics purported to render to the Insureds. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products.

135.    To the extent any examination was actually performed at all, the Prescribers failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals.

136.    Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety as the Prescribers often did not know whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

137.    The Prescribers also did not document in their examination reports whether the patients were intolerant of oral medications necessitating a prescription for a Fraudulent Topical Pain Product dispensed by one or more of the Pharmacy Provider Defendants.

138.    The Prescribers also continuously failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by one or more of the Pharmacy Provider Defendants were actually used by the patient.

139.    The Prescribers also continuously failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by one or more of the Pharmacy Provider Defendants provided any pain relief to the patient or were otherwise effective for the purpose prescribed.

140.    At times, the Prescribers failed to document in any of their examination reports that the patient even received a Fraudulent Pharmaceutical.

141.    Each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur as a result of adverse drug reactions.  A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

142.    Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., naproxen and Diclofenac Gel 3%, Diclofenac Solution 1.5%, or Pennsaid Transdermal Solution 2%) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

143.    Despite the risks of therapeutic duplication, the Prescribers routinely prescribed, and the Pharmacy Provider Defendants and Streamline routinely billed for multiple NSAIDs dispensed to the same Insured on a single date of service.

i.      **The Fraudulent Diclofenac and Lidocaine Ointment Prescriptions**

144.    In accordance with the fraudulent scheme discussed above, the Pharmacy Provider Defendants and Streamline primarily and routinely billed GEICO for exorbitantly priced topical pain gels, ointments and lotions, mostly in the form of Diclofenac Sodium Gel 3%, Diclofenac Sodium Solution 1.5%, and Pennsaid Transdermal Solution 2% (collectively, "Topical Diclofenac"), pursuant to duplicitous prescriptions solicited from Prescribers and Clinic Controllers in exchange for kickbacks or other financial incentives.

145.    The Pharmacy Defendants solicited the Prescribers and the Clinic Controllers to provide them with voluminous prescriptions for Topical Diclofenac because the Pharmacy Defendants could readily buy Topical Diclofenac at low cost but have the Pharmacy Provider Defendants and Streamline bill GEICO and other New York No-Fault insurers huge sums based on egregiously high wholesale prices.

146.    Topical Diclofenac is an NSAID typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet.  It has not been proven effective for treating strains or sprains.

147.    The United States Food and Drug Administration ("FDA") requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

148.    A "Black Box Warning" warning is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

149.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular

thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

150.    Notwithstanding the most common uses for Topical Diclofenac, or the risks associated with the drug, the Pharmacy Defendants steered the Prescribers to prescribe diclofenac sodium in the form of Topical Diclofenac while oftentimes recommending the patient continue the use of oral NSAIDs – such as ibuprofen, naproxen, and celecoxib – or simultaneously prescribing oral NSAIDs and other Fraudulent Topical Pain Products.

151.    Prescribing Topical Diclofenac, while simultaneously prescribing and dispensing oral NSAIDS to patients, is therapeutic duplication which results in increased risk with no additional therapeutic benefit.

152.    Nevertheless, the Prescribers consciously prescribed and the Pharmacy Defendants consciously dispensed Topical Diclofenac in conjunction with oral NSAIDs and/or other Fraudulent Topical Pain Products to numerous Insureds, despite the risks it posed to the Insureds' health and well-being.

153.    In the instant matter, by engaging in such therapeutic duplication, the Prescribers and the Pharmacy Defendants put patients at increased risk of serious cardiovascular and gastrointestinal events (without any additional therapeutic benefit) as the use of oral NSAIDs increases the "Black Box Warning" risks associated with topical diclofenac sodium.

154.    The Topical Diclofenac was prescribed pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

155.   In keeping with the fact that Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribers virtually never stated the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed Topical Diclofenac.

156.   In further keeping with the fact that the Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports performed by the Prescribers virtually never addressed whether the Topical Diclofenac prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

157.   Defendants' billing to GEICO for Topical Diclofenac exceeded $1,266,100.00.

158.   Specifically, Boulevard LLC primarily dispensed Topical Diclofenac in the forms of Diclofenac Gel 3%, typically billing between $1,891.00 and $2,834.00 per prescription, and Pennsaid Transdermal Solution 2%, typically billing $2,631.00 per prescription.   To-date, Boulevard LLC billed GEICO over $640,900.00 for Topical Diclofenac.

159.   Albertson Pharmacy primarily dispensed Topical Diclofenac in the form of Diclofenac Gel 3% and typically billed between $1,891.00 and $2,834.00 per prescription.   To-date, Albertson Pharmacy billed GEICO over $326,700.00 for Topical Diclofenac.

160.   Sterling I primarily dispensed Topical Diclofenac in the forms of Diclofenac Gel 3%, typically billing $3,396.00 per prescription, and Pennsaid Transdermal Solution 2%, typically billing between $2,626.40 and $2,984.80 per prescription.   To-date, Sterling I billed GEICO over $58,100.00 for Topical Diclofenac.

161.   Streamline primarily billed for Topical Diclofenac in the forms of Diclofenac

Sodium Solution 1.5%, typically billing between $1,179.46 and $2,700.00 per prescription. To-date, Streamline billed GEICO over $240,300.00 for Topical Diclofenac.

162.    Not surprisingly, the Office of Inspector General of the U.S. Department of Health & Human Services issued a report which noted that one of the most common products billed for by pharmacies with questionable billing was diclofenac sodium because, among other reasons, there is a striking difference between the cost of a compounded topical containing diclofenac sodium and a non-compounded version of the same drug. In that same report, the OIG also noted that many pharmacies in New York State are among the most questionable in the nation. See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

163.    In addition to the egregious number of Topical Diclofenac prescriptions dispensed and billed by the Pharmacy Provider Defendants and Streamline, in accordance with the fraudulent scheme discussed above, the Pharmacy Provider Defendants and Streamline routinely billed GEICO for exorbitantly priced topical Lidocaine 5% Ointment, pursuant to duplicitous prescriptions solicited from the Prescribers and the Clinic Controllers in exchange for kickbacks or other incentives.

164..    The U.S. Department of Health's 2018 report similarly noted that topical lidocaine, like diclofenac, has been subject to fraud and abuse.  See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

165..    Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

166..   Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the top few millimeters of skin.  Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

167.   Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

168.   Despite this, the Prescribers never recommended Insureds first use over-the-counter lidocaine products to treat their minor aches and pains sustained in fender-bender type motor vehicle accidents. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribers routinely prescribed Insureds Lidocaine 5% Ointment and directed the prescriptions to the Pharmacy Provider Defendants.

169.   For example, the Prescribers never recommended Insureds first try commonly available commercial products, such as Icy Hot Lidocaine or Aspercreme with Lidocaine, both of which contain 4% lidocaine and are available at most well-known pharmacy retailers at a mere fraction of the cost, including Rite-Aid and Target for advertised prices generally less than $10.00.

170.   In keeping with the fact that the Defendants submitted bills to GEICO pursuant to collusive arrangements with the Prescribers and Clinic Controllers and pursuant to fraudulent, predetermined and profit-driven treatment protocols, the Lidocaine 5% Ointment prescriptions, like the Topical Diclofenac prescriptions, were often issued contemporaneous to oral NSAIDs and/or other Fraudulent Topical Pain Products such as topical Lidocaine 5% Patches and MedX-Lidocaine Patches.

171.    As with the prescriptions for Topical Diclofenac, the initial examination reports prepared by the Prescribers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed a Lidocaine 5% Ointment.  Likewise, the follow-up examination reports virtually never addressed whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

172.    Defendants' billing to GEICO for Lidocaine 5% Ointment exceeded $1,177,500.00.

173.    Specifically, Boulevard LLC typically billed between $1,223.00 and $1,527.50 per prescription for Lidocaine 5% Ointment and, to-date, billed GEICO over $444,300.00 for this Fraudulent Topical Pain Product.

174.    Albertson Pharmacy typically billed between $1,223.00 and $1,527.50 per prescription for Lidocaine 5% Ointment and, to-date, billed GEICO over $356,900.00 for this Fraudulent Topical Pain Product

175.    Sterling I typically billed $2,472.50 per prescription for Lidocaine 5% Ointment and, to-date, billed GEICO over $148,900.00 for this Fraudulent Topical Pain Product.

176.    Sterling II typically billed between $1,978.00 and $2,472.50 per prescription for Lidocaine 5% Ointment and, to-date, billed GEICO over $180,400.00 for this Fraudulent Topical Pain Product.

177.    Streamline primarily billed $1,141.50 per prescription for Lidocaine 5% Ointment and, to-date, billed GEICO over $46,800.00 for this Fraudulent Topical Pain Product.

178.    The Defendants' egregious billing coupled with the fact that the Prescribers failed to properly document – or even document at all – the prescriptions for Topical Diclofenac and Lidocaine 5% Ointment, or the Insureds' use of these medications, further indicates that there was no legitimate medical reason for the Prescribers to have prescribed large volumes of these medications to the Insureds, or for the Pharmacy Defendants to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects.

### ii.    The Fraudulent Pain Patch Prescriptions

179.    As a further part of the scheme, the Defendants routinely billed GEICO for exorbitantly priced pain patches – primarily in the form of Lidocaine 5% Patches ("Lidocaine Patches") and MedX-Lidocaine Patches ("MedX Patches") (together, the "Fraudulent Pain Patches"), pursuant to duplicitous prescriptions solicited from the Prescribers and the Clinic Controllers in exchange for kickbacks or other incentives.

180.    In keeping with the fact that the Defendants steered the Prescribers to prescribe the Fraudulent Pharmaceuticals pursuant to predetermined protocols designed to maximize profits without regard for patient care, the Fraudulent Pain Patches were routinely dispensed and billed at exorbitant prices despite the availability of less expensive, commercially available FDA-approved patches.

181.    Notably, topical pain patches in which lidocaine is the primary ingredient are primarily used to treat chronic post-herpetic neuropathic pain, although studies have shown that any relief these patches provide – beyond topical anesthetic relief – is more attributable to its placebo effect rather than the pharmacological action of the patches themselves.  In fact, both the Lidocaine Patches and MedX Patches are insufficient to produce a complete sensory block.

182.    Nevertheless, the Prescribers routinely prescribed these patches to Insureds for sprain/strain injuries sustained in fender-bender type motor vehicle accidents.

183.    The Fraudulent Pain Patches were routinely prescribed at the time of the initial examination – during the acute stages of the Insureds' pain symptoms.

184.    Like the prescriptions for Lidocaine 5% Ointment, the Prescribers never recommended Insureds first use over-the-counter lidocaine products – which are available to treat their often acute, minor strain/sprain injuries.

185.    As with the prescriptions for the other Fraudulent Topical Pain Products, the initial examination reports prepared by the Prescribers virtually never set forth the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed a Fraudulent Pain Patch. Likewise, the follow-up examination reports virtually never addressed whether the Fraudulent Pain Patches prescribed provided any pain relief to the patient or were otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

186.    In keeping with the fact that the Defendants acted with gross indifference to patient care and safety, the patients were generally not instructed on the safe use, side effects or risks associated with the Lidocaine Patches and MedX Patches.

187.    Moreover, the Prescribers and Clinic Controllers routinely prescribed or caused to be prescribed Lidocaine or MedX Patches simultaneous to Lidocaine 5% Ointment – again engaging in therapeutic duplication – and other Fraudulent Topical Pain Products.

188.    Defendants' billing to GEICO for the Fraudulent Pain Patches exceeded $843,900.00.

189.    Specifically, Boulevard LLC typically billed between $$679.10 and $2,381.00 per

prescription for Fraudulent Pain Patches and, to-date, billed GEICO over $393,400.00 for these Fraudulent Topical Pain Products.

190.    Albertson Pharmacy typically billed between $679.10 and $2,381.00 per prescription for Fraudulent Pain Patches and, to-date, billed GEICO over $318,900.00 for these Fraudulent Topical Pain Products.

191.    Sterling I typically billed between $449.40 and $674.10 per prescription for Fraudulent Pain Patches and, to-date, billed GEICO over $14,425.00 for these Fraudulent Topical Pain Products.

192.    Sterling II typically billed between $280.80 and $561.60 per prescription for Fraudulent Pain Patches and, to-date, billed GEICO over $36,200.00 for these Fraudulent Topical Pain Products.

193.    Streamline typically billed between $1,440.00 and $2,880.00 per prescription for Fraudulent Pain Patches and, to-date, billed GEICO over $80,900.00 for these Fraudulent Topical Pain Products.

C.    **The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among the Defendants, Prescribers, and Clinic Controllers**

194.    To effectuate the fraudulent scheme, the Pharmacy Defendants steered the Prescribers and Clinic Controllers to routinely prescribe and direct prescriptions to the Pharmacy Provider Defendants for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

195.    New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain, and (ii)

"directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

196.    Here, the Pharmacy Defendants colluded with the Streamline Defendants to target the Fraudulent Topical Pain Products to "optimize" the Pharmacy Provider Defendants' protocols" in order "leverage high profit margins" and "quadruple [] reimbursements for workers compensation, no fault, personal injury and auto prescriptions."

197.    The Pharmacy Defendants then colluded with Prescribers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribers, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and direct those prescriptions to the Pharmacy Provider Defendants so that they, and the Streamline Defendants, could bill GEICO huge sums.

198.    In furtherance of the scheme, the Prescribers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to the collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

199.    The Pharmacy Defendants supplied the Prescribers and Clinic Controllers with preprinted Fraudulent Prescription Forms so Prescribers could repeatedly issue predetermined and/or unnecessary prescriptions for the expensive Fraudulent Pharmaceuticals that the Pharmacy Provider Defendants "specialized" in dispensing in order to exploit the patients' No-Fault Benefits.

200.    The Prescribers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Pharmacy Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were

involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products were prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and that the Fraudulent Pharmaceuticals were prescribed and dispensed without any attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

201.    The Pharmacy Defendants, in collusion with the Prescribers and Clinic Controllers, made sure that the Insureds never had the option to use a pharmacy of their choosing, and instead ensured that the prescriptions for the Fraudulent Pharmaceuticals were directed to the Pharmacy Provider Defendants notwithstanding that (i) in many instances the No-Fault Clinics and the patients themselves were located in counties far from the Pharmacy Provider Defendants and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

202.    The Pharmacy Provider Defendants purported to mail or deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes, without the patient ever seeing the actual written prescription and, in many cases, without the patient even knowing that they were to receive a Fraudulent Pharmaceutical.

203.    Alternatively, the Insureds were given the Fraudulent Pharmaceuticals dispensed by the Pharmacy Provider Defendants directly from the front desk staff at the various No-Fault Clinics, again without ever seeing the actual prescription or, in many cases, not even knowing that they were to receive a Fraudulent Pharmaceutical.

204.    The Pharmacy Defendants, Prescribers, and Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by the Pharmacy Provider Defendants, and to ensure that the Defendants benefitted financially from the prescriptions.

205.    The Prescribers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

206.    The Prescribers and Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Provider Defendants rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

207.    The Pharmacy Defendants, Prescribers, and Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including using the Fraudulent Prescription Forms distributed by the Pharmacy Defendants, intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to the Pharmacy Provider Defendants, unless they profited from their participation in the illegal scheme.

208.    But for the payments of kickbacks or other financial incentives from the Pharmacy Defendants, the Prescribers would not have prescribed the Fraudulent Topical Pain Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribers and Clinic Controllers would not have directed the prescriptions to the Pharmacy Provider Defendants.

209.    The Pharmacy Defendants, Prescribers, and Clinic Controllers affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

210.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Pharmacy Defendants paid a financial kickback or provided other financial incentives, and the Prescribers and Clinic Controllers received a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by the Pharmacy Provider Defendants.

211.    Upon information and belief, the payment of kickbacks by the Pharmacy Defendants was made at or near the time the prescriptions were issued.

**D.      The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

212.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

213.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

214.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

215.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

216. The Pharmacy Defendants solicited the Clinic Controllers and the Prescribers to provide them with voluminous prescriptions for the Fraudulent Topical Pain Products because the Defendants could readily buy the Fraudulent Topical Pain Products at low cost but bill GEICO and other New York No-Fault insurers inflated amounts based on egregiously high wholesale prices.

217. The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive "average wholesale prices," in order to inflate the billing submitted by the Pharmacy Provider Defendants and Streamline and to maximize their profits.

218. In support of their charges, Albertson Pharmacy and Boulevard LLC typically submitted: (i) the Prescribers' prescription forms; (ii) a HCFA 1500 Form which included the purported NDC numbers, units, and corresponding charges for each drug product or ingredient; and (iii) executed assignment of benefits forms.  At times, Albertson Pharmacy and Boulevard LLC also submitted itemized invoices which included the Insureds' demographics, dates the prescriptions were purportedly filled, the purported NDC numbers, units, and corresponding charges, and the name of the Fraudulent Pharmaceutical dispensed.

219. In an effort to conceal the amount of fraudulent billing the Pharmacy Defendants submitted through Albertson Pharmacy and Boulevard LLC, they often billed for each Fraudulent Pharmaceutical on separate HCFA 1500 Forms even if those pharmaceuticals were dispensed to the Insured on the same date of service.

220. In support of their charges, Sterling I and Sterling II typically submitted: (i) the Prescribers' prescription forms; (ii) a "No-Fault" form, known as an NF-3 Form, which included the purported NDC numbers, units, and corresponding charges for each drug product or ingredient; (iii) an itemized invoice which included the Insureds' demographics, dates the prescriptions were

purportedly filled, the purported NDC numbers, units, and corresponding charges, and the name of the Fraudulent Pharmaceuticals dispensed; and (iv) executed assignment of benefits forms.

221.    Streamline only ever submitted HCFA 1500 Forms in support of its charges without any other supporting documentation whatsoever (i.e., prescriptions, delivery receipts, executed assignment of benefit forms, itemized invoices, etc.).

222.    The NDC numbers listed on the NF-3 and HCFA 1500 Forms submitted by the Defendants are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

223.    The Defendants never submitted to GEICO their wholesale purchase invoices demonstrating how much the Pharmacy Provider Defendants actually paid the supplier for the Fraudulent Topical Pain Products.

224.    The Defendants never submitted to GEICO any documents evidencing whether the Pharmacy Provider Defendants actually purchased topical pain products with the particular NDC number used in the billing, representing purchases from a particular supplier in a particular quantity.

225.    In fact, the Pharmacy Provider Defendants never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Topical Pain Products that they dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for Fraudulent Topical Pain Products.

226.    The Pharmacy Provider Defendants paid only a fraction of the "average wholesale price" of the Fraudulent Topical Pain Products that the Defendants targeted to use in connection with the Pharmacy Provider Defendants' and Streamline's billing, but nevertheless billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of an array of other FDA approved, proven effective medications or commercially available over-the-counter products.

227. Further, upon information and belief, the Pharmacy Provider Defendants often did not actually purchase topical pain products with the particular NDC number used in the billing, and instead purchased topical pain products from different suppliers and/or in different quantities but nonetheless used the NDC number in their billing that generated the highest reimbursement amount in order to inflate the Defendants' profits.

### E.     The Fraudulent Duplicate Billing By Streamline

228. In keeping with the fact that the Fraudulent Pharmaceuticals were prescribed, dispensed, and billed to maximize profit without regard to patient care, at times, Streamline and Mantripraga submitted claims for reimbursement to GEICO that were duplicative of Boulevard LLC, whereby they each sought reimbursement for the same Fraudulent Pharmaceuticals, dispensed to the same Insured.

229. There is an identifiable pattern in which Boulevard LLC submitted claims for reimbursement for one or more Fraudulent Pharmaceutical along with a prescription from a Prescriber. Thereafter, within a matter of days, Streamline and Mantripraga submitted a claim in which they always seeks reimbursement for the same set of four specific Fraudulent Pharmaceuticals – at least one of which was just dispensed and billed by Boulevard LLC only days before – identifying the same Prescriber who issued the prescription submitted by Boulevard LLC as the healthcare practitioner who authorized the prescriptions billed by Streamline.   For example:

- On April 14, 2020, Boulevard LLC billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% allegedly dispensed to Insured R.B. pursuant to a prescription issued by Jordan Fersel, M.D. ("Dr. Fersel") on April 1, 2020.  The next day – April 15, 2020 – Streamline billed for Lidocaine 5% Ointment, Diclofenac Solution 1.5%, naproxen, and cyclobenzaprine purportedly dispensed to R.B. pursuant to a prescription allegedly issued by Dr. Fersel.

- On April 3, 2020, Boulevard LLC billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% allegedly dispensed to Insured P.D. pursuant to an undated prescription issued by Alexander Baldonado, M.D. ("Dr. Baldonado"). The

next day – April 4, 2020 – Streamline billed for Lidocaine 5% Ointment, Diclofenac Solution 1.5%, naproxen, and cyclobenzaprine purportedly dispensed to P.D. pursuant to a prescription allegedly issued by Dr. Baldonado.

- On April 15, 2020, Boulevard LLC billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% allegedly dispensed to Insured C.P. pursuant to a prescription issued by Dr. Fersel on April 1, 2020. The next day – April 16, 2020 – Streamline billed for Lidocaine 5% Ointment, Diclofenac Solution 1.5%, naproxen, and cyclobenzaprine purportedly dispensed to C.P. pursuant to a prescription allegedly issued by Dr. Fersel.

- On April 3, 2020, Boulevard LLC billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% allegedly dispensed to Insured W.C. pursuant to an undated prescription issued by Dr. Baldonado. The next day – April 4, 2020 – Streamline billed for Lidocaine 5% Ointment, Diclofenac Solution 1.5%, naproxen, and cyclobenzaprine purportedly dispensed to W.C. pursuant to a prescription allegedly issued by Dr. Baldonado.

- On April 3, 2020, Boulevard LLC billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% allegedly dispensed to Insured M.S. pursuant to a prescription issued by David Abbattematteo, M.D. ("Dr. Abbattematteo") on April 2, 2020. One week later – on April 10, 2020 – Streamline billed for Lidocaine 5% Ointment, Diclofenac Solution 1.5%, naproxen, and cyclobenzaprine purportedly dispensed to M.S. pursuant to a prescription allegedly issued by Dr. Abbattematteo.

- On April 3, 2020, Boulevard LLC billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% allegedly dispensed to Insured D.F.S. pursuant to an undated prescription issued by Dr. Baldonado. Four days later – on April 7, 2020 – Streamline billed for Lidocaine 5% Ointment, Diclofenac Solution 1.5%, naproxen, and cyclobenzaprine purportedly dispensed to D.F.S. pursuant to a prescription allegedly issued by Dr. Baldonado.

- On April 3, 2020, Boulevard LLC billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% allegedly dispensed to Insured L.R. pursuant to an undated prescription issued by Dr. Baldonado. Four days later – on April 7, 2020 – Streamline billed for Lidocaine 5% Ointment, Diclofenac Solution 1.5%, naproxen, and cyclobenzaprine purportedly dispensed to L.R. pursuant to a prescription allegedly issued by Dr. Baldonado.

- On March 31, 2020, Boulevard LLC billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% allegedly dispensed to Insured B.E. pursuant to a prescription issued by Dr. Baldonado on March 19, 2020. Two days later – on April 2, 2020 – Streamline billed for Lidocaine 5% Ointment, Diclofenac Solution 1.5%, naproxen, and cyclobenzaprine purportedly dispensed to B.E. pursuant to a prescription allegedly issued by Dr. Baldonado.

- On April 15, 2020, Boulevard LLC billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% allegedly dispensed to Insured C.R. pursuant to a prescription issued by Dr. Fersel on March 20, 2020. The next day – April 16, 2020 – Streamline billed for Lidocaine 5% Ointment, Diclofenac Solution 1.5%, naproxen, and cyclobenzaprine purportedly dispensed to C.R. pursuant to a prescription allegedly issued by Dr. Fersel.

- On March 15, 2020, Boulevard LLC billed for Lidocaine 5% Ointment and naproxen allegedly dispensed to Insured J.L. pursuant to a prescription issued by Pauline Raitses, M.D. ("Dr. Raitses") on March 10, 2020. Two weeks later – on March 30, 2020 – Streamline billed for Lidocaine 5% Ointment, Diclofenac Solution 1.5%, naproxen, and cyclobenzaprine purportedly dispensed to J.L. pursuant to a prescription allegedly issued by Dr. Raitses.

- On March 15, 2020, Boulevard LLC billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% allegedly dispensed to Insured P.H. pursuant to a prescription issued by Stanley Kim, M.D. ("Dr. Kim") on March 9, 2020. Two weeks later – March 31, 2020 – Streamline billed for Lidocaine 5% Ointment, Diclofenac Solution 1.5%, naproxen, and cyclobenzaprine purportedly dispensed to P.H. pursuant to a prescription allegedly issued by Dr. Kim.

- On April 3, 2020, Boulevard LLC billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% allegedly dispensed to Insured E.W. pursuant to an undated prescription issued by Dr. Baldonado. Six days later – on April 9, 2020 – Streamline billed for Lidocaine 5% Ointment, Diclofenac Solution 1.5%, naproxen, and cyclobenzaprine purportedly dispensed to E.W. pursuant to a prescription allegedly issued by Dr. Baldonado.

- On March 27, 2020, Boulevard LLC billed for Lidocaine 5% Ointment and MedX-Lidocaine Patches allegedly dispensed to Insured K.B. pursuant to a prescription issued by Dr. Kim on March 26, 2020. One week later – on April 3, 2020 – Streamline billed for Lidocaine 5% Ointment, Diclofenac Solution 1.5%, naproxen, and cyclobenzaprine purportedly dispensed to K.B. pursuant to a prescription allegedly issued by Dr. Kim.

- On April 13, 2020, Boulevard LLC billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% allegedly dispensed to Insured L.B. pursuant to a prescription issued by Dr. Abbattematteo on April 9, 2020. Two days later – on April 15, 2020 – Streamline billed for Lidocaine 5% Ointment, Diclofenac Solution 1.5%, and cyclobenzaprine purportedly dispensed to L.B. pursuant to a prescription allegedly issued by Dr. Abbattematteo.

- On April 15, 2020, Boulevard LLC billed for Lidocaine 5% Ointment and Pennsaid Transdermal Solution 2% allegedly dispensed to Insured B.S. pursuant to an undated prescription issued by Dr. Fersel. The next day – April 16, 2020 – Streamline billed for Lidocaine 5% Ointment, Diclofenac Solution 1.5%, naproxen,

and cyclobenzaprine purportedly dispensed to B.S. pursuant to a prescription allegedly issued by Dr. Fersel.

- On March 31, 2020, Boulevard LLC billed for Lidocaine 5% Ointment, Lidocaine Patches 5%, and naproxen allegedly dispensed to Insured C.C. pursuant to a prescription issued by Michael Alleyne, M.D. ("Dr. Alleyne") on March 13, 2020. The next day – April 1, 2020 – Streamline billed for Lidocaine 5% Ointment, Diclofenac Solution 1.5%, naproxen, and cyclobenzaprine purportedly dispensed to C.C. pursuant to a prescription allegedly issued by Dr. Alleyne.

230.    Notably, the only document Streamline submitted in support of its claims for reimbursement is a HCFA 1500 Form which identifies the Fraudulent Pharmaceuticals allegedly dispensed and the Prescriber who purportedly issued the prescription.  The Streamline Defendants never submitted copies of the prescriptions, executed AOBs, delivery receipts, or any other supporting documents.

231.    Moreover, naproxen and Diclofenac Solution 1.5% are both NSAIDs and their simultaneous use constitutes therapeutic duplication and exposes the Insured to increased risks. Nevertheless, Streamline consistently submitted claims for reimbursement for both of these Fraudulent Pharmaceuticals on the same date of service.

232.    The Streamline Defendants submitted their fraudulent, duplicative claims for reimbursement to GEICO knowing that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the Fraudulent Pharmaceuticals were the product of illegal, collusive arrangements intended to inflate the billing to insurers and to financially enrich the Defendants; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and dispensed in large volumes to Insureds at inflated charges; (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of other prescription and over-the-

counter medications proven to have therapeutic effects and available at a fraction of the cost; and

(v) Streamline is not a licensed healthcare provider and therefore is not eligible for reimbursement

of No-Fault benefits.

**V.      The Defendants' Submission to GEICO of Fraudulent NF-3 and HCFA 1500 Forms**

233.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault

Benefits consistently have been submitted to GEICO by and on behalf of the Pharmacy Provider

Defendants and Streamline seeking payment for pharmaceuticals for which they are ineligible to

receive.

234.    These forms, including NF-3 Forms, HCFA-1500 Forms, and other supporting

records that the Defendants submitted or cause to be submitted to GEICO, were false and

misleading in the following material respects:

      i.      The NF-3 Forms, HCFA-1500 Forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

     ii.     The NF-3 Forms, HCFA-1500 Forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Pharmacy Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with the Prescribers and Clinic Controllers in order to steer voluminous and illegal prescriptions to the Pharmacy Provider Defendants for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives;

    iii.     The NF-3 Forms, HCFA-1500 Forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did

not comply with all material licensing requirements in that they dispensed and billed for Fraudulent Pharmaceuticals pursuant to illegal, invalid, duplicitous, and forged prescriptions;

iv.    The NF-3 Forms, HCFA-1500 Forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals;

v.    The NF-3 Forms, HCFA-1500 Forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, Streamline is not a licensed provider of healthcare services, nor is it authorized to conduct business in New York and, therefore, is not eligible for reimbursement of No-Fault benefits under New York law; and

vi.    The NF-3 Forms, HCFA-1500 Forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Pharmacy Defendants made false statements on registration, licensing, and application documents filed on behalf of the Pharmacy Provider Defendants with the NYS Pharmacy Board in order to illegally conceal the identities of all of the owners and controllers of the Pharmacy Provider Defendants in violation of law.

## VI.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

235.    The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

236.    To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

237.    Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that (i) the Pharmacy Provider Defendants were not truly owned and controlled by the owners listed of record; (ii) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (iii) the Defendants were involved in collusive kickback arrangements with the Prescribers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing submitted to GEICO and other New York insurance companies.

238.    The Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single licensee.

239.    The Defendants also caused billing to be submitted through multiple Pharmacy Provider Defendants on a single claim in order to reduce the amount of billing submitted through any one of them.

240.    The Defendants also caused billing to be submitted by each of the Pharmacy Provider Defendants for only a brief period of time in order to collect as much reimbursement as possible on their fraudulent claims, as quickly as possible, to prevent discovery of the wide-ranging scheme.

241.    At times, the Defendants also caused billing for pharmaceuticals dispensed to the same Insured on the same date of service to be submitted on separate NF-3 and or HCFA 1500 Forms to conceal the amount of billing submitted.

242.    The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

243.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.  In fact, the Pharmacy Provider Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that the Pharmacy Provider Defendants and Streamline have been engaged in fraud.

244.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $552,200.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants.

245.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### THE FIRST CLAIM FOR RELIEF
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

246.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

247.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $2,694,200.00 in fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through Boulevard LLC, Albertson Pharmacy, Sterling I, Sterling II, and Streamline.

248.    Boulevard LLC, Albertson Pharmacy, Sterling I, Sterling II, and Streamline have no right to receive payment for any pending bills submitted to GEICO because Boulevard LLC, Albertson Pharmacy, Sterling I, Sterling II, and Streamline billed for pharmaceutical products that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed solely for financial gain, without regard for genuine patient care.

249.    Boulevard LLC, Albertson Pharmacy, Sterling I, Sterling II, and Streamline have no right to receive payment for any pending bills submitted to GEICO because the Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered the Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Provider Defendants in exchange for unlawful kickbacks and other financial incentives.

250.    Boulevard LLC, Albertson Pharmacy, Sterling I, Sterling II, and Streamline have no right to receive payment for any pending bills submitted to GEICO because the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had the Pharmacy Provider Defendants dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

251.    Boulevard LLC, Albertson Pharmacy, Sterling I, Sterling II, and Streamline have no right to receive payment for any pending bills submitted to GEICO because the Defendants made and continue to make false and fraudulent misrepresentations to GEICO in that they submitted fraudulent claims to GEICO for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, duplicitous, and forged prescriptions and continue to seek collection on their unpaid claims.

252.     Streamline has no right to receive payment for any pending bills submitted to GEICO because Streamline is not a licensed provider of healthcare services in New York nor licensed to do business in New York and, therefore, is not eligible for reimbursement of No-Fault Benefits.

253.     Boulevard LLC, Albertson Pharmacy, Sterling I, and Sterling II have no right to receive payment for any pending bills submitted to GEICO because the Pharmacy Defendants made false statements on registration, licensing, and application documents filed with the New York State Education Department Board of Pharmacy in order to illegally conceal the identities of all of the owners and controllers of the Pharmacy Provider Defendants.

254.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Boulevard LLC, Albertson Pharmacy, Sterling I, Sterling II, and Streamline have no right to receive payment for any pending bills submitted to GEICO.

## THE SECOND CLAIM FOR RELIEF
### Against All Defendants
### (Common Law Fraud)

255.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

256.     The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Boulevard LLC, Albertson Pharmacy, Sterling I, Sterling II, and Streamline.

257.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

i.      in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

ii.     in every claim, the representation that Boulevard LLC, Albertson Pharmacy, Sterling I, and Sterling II acted in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered the Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Boulevard LLC, Albertson Pharmacy, Sterling I, and Sterling II in exchange for unlawful kickbacks and other financial incentives;

iii.    in every claim, the representation that Boulevard LLC, Albertson Pharmacy, Sterling I, Sterling II, and Streamline acted in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, duplicitous, forged prescriptions;

iv.     in every claim, the representation that Boulevard LLC, Albertson Pharmacy, Sterling I, Sterling II, and Streamline acted in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with inflated charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law;

v.      in every claim, the representation that Boulevard LLC, Albertson Pharmacy, Sterling I, and Sterling II acted accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Pharmacy Defendants made false statements on registration, licensing, and application documents filed with the New York State Education Department Board of Pharmacy in order to illegally conceal the identities of all of the owners and controllers of the Pharmacy Provider Defendants in violation of law; and

vi.     in every claim, the representation that Streamline acted in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits

pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact Streamline is not a licensed provider of healthcare services and is not licensed to do business in New York and, therefore, is ineligible for reimbursement of No-Fault Benefits.

258.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Albertson Pharmacy, Boulevard LLC, Sterling I, Sterling II, and Streamline that were not compensable under the No-Fault Laws.

259.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $552,200.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Albertson Pharmacy, Boulevard LLC, Sterling I, Sterling II, and Streamline.

260.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

261.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THE THIRD CLAIM FOR RELIEF
**Against All Defendants**
**(Unjust Enrichment)**

262.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

263.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

264.    When GEICO paid the bills and charges submitted by or on behalf of Boulevard LLC, Albertson Pharmacy, Sterling I, Sterling II, and Streamline for No-Fault Benefits, it

reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

265.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

266.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

267.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $552,200.00.

### THE FOURTH CLAIM FOR RELIEF
**Against the Record Owner Defendants**
**(Violation of 18 U.S.C. § 1962(c))**

268.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

269.    Boulevard LLC, Albertson Pharmacy, Sterling I, and Sterling II constitute an association-in-fact "enterprise" (the "Pharmacy Enterprise"), as defined in 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

270.    The members of the Pharmacy Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Boulevard LLC, Albertson Pharmacy, Sterling I, and Sterling II ostensibly are independent entities – with different names and tax identification numbers – that were created and/or operated as vehicles to achieve a common purpose – namely, to facilitate the

submission of fraudulent charges to GEICO and other insurers. The Pharmacy Enterprise has operated under several separate corporate names in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one company. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Pharmacy Enterprise acting individually or without the aid of each other.

271.   The Pharmacy Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by employing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO), by preparing and filing fraudulent applications and documents in order to obtain licenses and registrations necessary to operate as pharmacies in New York State, by creating and maintaining patient files and other records, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of insurance payments, by selecting and purchasing the targeted Fraudulent Pharmaceuticals from wholesalers, by coordinating the fraudulent scheme with various Prescribers and Clinic Controllers operating at multiple No-Fault Clinics including obtaining prescriptions from them and delivering the Fraudulent Pharmaceuticals  to them to dispense to Insureds, by facilitating payments stemming from the illegal kickback arrangements, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

272.   Shukurov, Abramov, Mushyakov, and Derevyanko were employed by and/or associated with the Pharmacy Enterprise and knowingly conducted and/or participated, directly or indirectly, in the conduct of the Pharmacy Enterprise's affairs through a pattern of racketeering

activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over fourteen months seeking payments that the Pharmacy Provider Defendants were not eligible to receive under the No-Fault Laws. Specifically, the acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341:

(i)     The Record Owner Defendants devised, executed, and/or knowingly assisted in carrying out a scheme to defraud GEICO of their money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the healthcare claims for payment;

(ii)    Pursuant to the scheme, the Record Owner Defendants submitted, or caused to be submitted, to GEICO, through the Pharmacy Provider Defendants, false and fraudulent claims and information in which the Record Owner Defendants concealed that the charges submitted were for services provided pursuant to illegal, collusive agreements, kickbacks, fraudulent and forged prescriptions, and for financial incentive rather than genuine patient care;

(iii)   Pursuant to the scheme, the Record Owner Defendants submitted, or caused to be submitted, to GEICO, through the Pharmacy Provider Defendants, false and fraudulent claims and information in which the Record Owner Defendants falsely represented that the Fraudulent Pharmaceuticals that the Pharmacy Provider Defendants billed for were medically necessary when in fact they were not medically necessary and were instead dispensed and billed pursuant to predetermined treatment protocols solely to maximize profits; and

(iv)    Pursuant to the scheme, the Record Owner Defendants submitted, or caused to be submitted, to GEICO, through the Pharmacy Provider Defendants, false and fraudulent claims and information in which the Defendants illegally conceal the identities of all of the owners and controllers of the Pharmacy Provider Defendants.

For the purpose of executing this scheme and artifice to defraud, the Record Owner Defendants submitted, or caused to be submitted, such false and fraudulent claims and information to GEICO by use of the mail that caused GEICO to make payments for said fraudulent claims. A

representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" – "5".

273.    The Pharmacy Enterprise's business is racketeering activity, inasmuch as it exists for the purpose of submitting fraudulent charges to insurers and seeking to collect on the submitted fraudulent charges.  The predicate acts of mail fraud are the regular way in which the Record Owner Defendants operated the Pharmacy Enterprise and acts of mail fraud therefore are essential for the Pharmacy Enterprise to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud, continuous changing of TIN numbers and entities, implies a threat of continued criminal activity, as does the fact that the Record Owner Defendants continue to attempt collection on the fraudulent billing submitted through the Pharmacy Provider Defendants to the present day.

274.    The Pharmacy Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO (and likely other automobile insurers). These inherently unlawful acts are taken by the Pharmacy Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO (and likely other automobile insurers) through fraudulent no-fault billing.

275.    GEICO has been injured in their business and property by reason of the above-described conduct in that they have paid at least $552,200.00 pursuant to the fraudulent bills submitted in furtherance of the Pharmacy Enterprise.

276.    By reason of their injuries, Plaintiffs are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.      On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Albertson Pharmacy, Boulevard LLC, Sterling I, Sterling II, and Streamline have no right to receive payment for any pending bills, amounting to approximately $2,694,200.00 in charges submitted to GEICO;

B.      On the Second Claim For Relief against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $552,200.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.      On the Third Claim For Relief against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $552,200.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

D.      On the Fourth Claim for Relief against the Record Owner Defendants, for compensatory damages in an amount to be determined at trial but in excess of $552,200.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

Dated:  Uniondale, New York
        April 14, 2022

RIVKIN RADLER LLP

By:   /s/ *Michael A. Sirignano, Esq.*
        Michael A. Sirignano
        Barry I. Levy
        Priscilla D. Kam
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*